# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

FELD MOTOR SPORTS, INC.      §
                                  §
v.                                        §         CASE NO. 4:14-CV-543
                                  §         LEAD
                                  §         Judge Mazzant
TRAXXAS, LP                   §

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Traxxas, LP's Renewed Motion for Judgment as a Matter of Law, Motion for New Trial or Alternative Motion to Amend/Modify the Judgment (Dkt. #168). After reviewing the relevant pleadings and the relevant trial testimony and evidence, the Court finds that the motion should be denied.

## PROCEDURAL BACKGROUND

On April 14, 2014, Traxxas LP ("Traxxas") filed its action against Feld Motor Sports, Inc. ("Feld") in the 429th District Court of Collin County, Texas, in which it sought declaratory relief, stating that it did not owe Feld royalties on the two-wheel drive Brushless Stampede ("the Stampede VXL"), the Nitro Stampede, and the Stampede 4x4 (*See* Dkt. #3 in 4:14-cv-463). On July 11, 2014, the case was removed to the Eastern District of Texas, and filed as *Traxxas, LP v. Feld Motor Sports, Inc.*, No. 4:14-cv-463 (E.D. Tex. 2014) (Dkt. #1).

On July 11, 2014, Feld filed its action against Traxxas in the United States District Court for the Eastern District of Virginia, in which it alleged that Traxxas has breached the License Agreement, breached the implied covenant of good faith and fair dealing, failed to pay audit expenses, and failed to pay interest on late payments (Dkt. #1). On August 15, 2014, the case

was transferred to the Eastern District of Texas, and filed as *Feld Motor Sports, Inc. v. Traxxas, LP*, No. 4:14-cv-543 (E.D. Tex. 2014) (Dkt. #21).

On April 3, 2015, Traxxas filed its Motion for Summary Judgment (Dkt. #51). On April 27, 2015, Feld filed its response (Dkt. #84). On May 11, 2015, Traxxas filed its reply (Dkt. #97). On May 21, 2015, Feld filed its sur-reply (Dkt. #105).

On April 3, 2015, Feld filed its Motion for Summary Judgment (Dkt. #54). On April 27, 2015, Traxxas filed its response (Dkt. #81), and file its objections to Feld's Summary Judgment Evidence (Dkt. #80). On May 11, 2015, Feld filed its reply (Dkt. #92), and filed its response to Traxxas's objections (Dkt. #96). On May 21, 2015, Traxxas filed its sur-reply (Dkt. #109), and it reply to its objections (Dkt. #108). On June 1, 2015, Feld filed its sur-reply to Traxxas's objections (Dkt. #111). On May 11, 2015, Traxxas filed its objections to Feld's summary judgment opposition evidence (Dkt. #100). On May 21, 2015, Feld filed its response (Dkt. #104). On June 1, 2015, Traxxas filed its reply (Dkt. #112). On June 11, 2015, Feld filed its sur-reply (Dkt. #113). On July 31, 2015, the Court denied both Traxxas's Motion for Summary Judgment and Feld's Motion for Summary Judgment, finding that material fact issues existed in the case (Dkt. #118).

On June 12, 2015, Feld filed its Motion to Consolidate Cases and to Remain as Plaintiff (Dkt. #98 in 4:14-cv-463). Also on June 12, 2015, Traxxas filed its Unopposed Motion to Consolidate Cases and Opposed Motion to Establish Order of Proof (Dkt. #99 in 4:14-cv-463). On June 23, 2015, Feld filed its response to Traxxas's moton (Dkt. #101 in 4:14-cv-463). On June 24, 2015, Traxxas filed its response to Feld's motion (Dkt. #102 in 4:14-cv-463). On June 24, 2015, the Court held a hearing on consolidation. Following the hearing, the Court ordered the matters *Feld Motor Sports, Inc. v. Traxxas, LP*, No. 4:14-cv-543, and *Traxxas, LP v. Feld*

*Motor Sports, Inc.*, No. 4:14-cv-463, to be consolidated (Dkt. #103 in 4:14-cv-463). However, the Court held its determination as to which case would be the lead case until a later date (Dkt. #103 in 4:14-cv-463). On July 31, 2015, after considering the relevant pleadings, the Court determined that Feld would remain as Plaintiff in the consolidated cases, and that the No. 4:14-cv-543 case would be the lead case in the consolidated action (Dkt. #119 in 4:14-cv-543).

The trial began on August 24, 2015. At the close of Feld's case-in-chief, Traxxas made a motion for judgment as a matter of law, in which it requested that the Court grant judgment as a matter of law in favor of Traxxas, as Feld had not proved its case. The Court denied Traxxas's motion. On August 31, 2015, Feld requested judgment as a matter of law, which the Court denied. On September 1, 2015, the jury rendered its verdict and found the following: (1) the parties intended the License Agreement to include (a) the Stampede Brushless VXL; (b) the Stampede Brushed 4x4; (c) the Stampede Brushless 4x4 VXL; and (d) the Nitro Stampede, when calculating royalties; and (2) Traxxas owed Feld $955,620.30 in unpaid royalties under the License Agreement (Dkt. #162).

On October 7, 2015, Traxxas filed its Renewed Motion for Judgment as a Matter of Law, Motion for New Trial or Alternative Motion to Amend/Modify the Judgment (Dkt. #168). On October 26, 2015, Feld filed its response (Dkt. #173). On November 5, 2015, Traxxas filed its reply (Dkt. #176). On November 16, 2015, Feld filed its sur-reply (Dkt. #179).

## FACTUAL BACKGROUND

At trial, Mark Abernethy ("Abernethy") testified that he began communicating with Kent Poteet ("Poteet") at Traxxas regarding a potential licensing arrangement between the two companies (Abernethy Trial Tr. (8/25/2015) at 10:9-21; Trial Ex. 12). On July 14, 2010, Abernethy sent an email to Poteet regarding Feld's "potential opportunity to be working with

Traxxas on a line of Monster Jam branded R/C monster trucks." (Trial Ex. 13). In the email, Abernethy refers to the "Stamped R/C Vehicles" and discusses the wholesale cost of $150 (*See* Trial Ex. 13). Abernethy testified that he received the information from Poteet (Abernethy Trial Tr. (8/25/2015) at 22:3-23:5; 25:10-18). Abernethy testified that a meeting between Feld and Traxxas was scheduled for July 28, 2010, for members of Feld's sponsorship and licensing teams to meet with Traxxas' executive team (Abernethy Trial Tr. (8/25/2015) at 21:5-16).

Abernethy testified that the meeting took place on July 28, 2010. Abernethy, Tim Murray, Alison Lort, John Leiber, and Suzanne Ludera represented Feld at the meeting, while Mike Jenkins ("Jenkins"), Tommy DeWitt ("DeWitt"), and Poteet represented Traxxas (Abernethy Trial Tr. (8/26/2015) at 2:14-3:4). The meeting took place at Traxxas headquarters in Plano, Texas (Abernethy Trial Tr. (8/26/2015) at 3:3-4). Abernethy testified that Traxxas products were displayed along a wall with probably forty to fifty vehicles on display (Abernethy Trial Tr. (8/26/2015) at 3:11-20). DeWitt also testified that "the majority of everything [Traxxas] sold was in the conference room." (DeWitt Trial Tr. at 15:10-16:20).

DeWitt testified that the meeting was "introducing Feld to the product" and doing a kind of "show and tell." (DeWitt Trial Tr. at 17:1-7). Although DeWitt remembers that Traxxas showed Feld "[t]he Stampedes[,]" he testified that there wasn't specific talk about any distinction between Stampede models (DeWitt Trial Tr. at 19:6-20:19). Abernethy also testified that during the July 28, 2010 meeting there was no specific discussion about the vehicles, but just an overview (Abernethy Trial Tr. (8/26/2015) at 5:24-6:6).

Following the meeting, Feld and Traxxas continued to negotiate on the terms of the License Agreement. On July 30, 2010, Abernethy sent Poteet an email, in which he thanked him for the meeting, and gave him a revised proposal that included an asterisk (Trial Ex. 17). The

asterisk stated, "[t]his sliding scale takes into consideration that Traxxas will be converting the Stamped line of R/C vehicles 100% to Monster Jam branded vehicles. It also takes into consideration that the Stamped line sells 30,000 units per year. If the Stamped line off [sic] R/C vehicles does not sell 30,000 units per year, then we'll need to adjust this sliding scale." (Trial Ex. 17). On August 4, 2010, Poteet responded to Abernethy's email, and in his revised proposal referred to "these Stampedes." (Trial Ex. 19).

On August 16, 2010, Abernethy sent another revised proposal to Poteet, in which he stated, "This takes into consideration that Traxxas will be converting the Stamped line of R/C vehicles 100% to Monster Jam branded vehicles. It also takes into consideration that the Stamped line sells 30,000 units per year. If the Stamped line off R/C vehicles does not currently sell 30,000 units per year, then we'll need to re-adjust." (Trial Ex. 22). On September 2, 2010, Abernethy sent a revised proposal to Poteet, in which he stated, "[t]he Stamped line of R/C's will be converted to MJ branded vehicles." (Trial Ex. 24). Poteet forwarded the email to Jenkins, and Jenkins told him to "[a]dd Stampede sales in to a total to get to the 30k." (Trial Ex. 25).

Milo Mattorano ("Mattorano") testified that during the final stages of negotiations, he was the lead negotiator for Traxxas (*See* Mattorano Trial Tr. (8/28/2015) at 26:11-27:15). Between September 21, 2010, through September 24, 2010, Feld and Traxxas sent a proposed License Agreement back-and-forth (*See* Trial Exs. 39, 215, 216, 217, 218, 219).

On October 11, 2010, Traxxas sent Feld a fully executed version of the Monster Jam License Agreement (the "License Agreement) (Tr. Ex. 11). The License Agreement gave Traxxas the right to use certain Intellectual Property of Feld in the marketing and sale of Traxxas's R/C trucks. (Tr. Ex. 11). In return, Feld would be paid a royalty on those sales. (Tr. Ex. 11). Specifically, the Licensing Agreement, in relevant states:

5. Royalty Rate: In determining the number of **Licensed Articles** on which Licensor will receive royalties, "**Licensed Articles**" shall be deemed to include **all R/C Vehicle Units and R/C Bodies** manufactured with the Stampede chassis and/or Stampede body, **whether or not branded with the Property or "Stampede."**

(Tr. Ex. 11 at p. 11 ¶ 5) (emphasis in original). The License Agreement also stated that "Licensed Articles" would be "[h]obby-grade battery-operated remote control operated monster truck vehicles ("**R/C Vehicle Units**") and monster truck vehicle bodies ("**R/C Bodies**") branded with the **Property**. Licensed Articles shall include a minimum of four (4) different monster truck molds of **R/C Bodies** each year, for each year during the Term other than 2010." (Tr. Ex. 11 at p. 11 at ¶ 2) (emphasis in original). It also contained a clause that stated that "**R/C Vehicle Units** must maintain a minimum wholesale cost of One Hundred Dollars ($100.00)." (Tr. Ex. 11 at p. 12 ¶ 14) (emphasis in original).

Abernethy testified that Feld believed that the Licensing Agreement allowed them to receive royalties on the entire Stampede Lineup (Abernethy Trial Tr. (8/26/2015 at 175:10-25). Mattorano testified that Traxxas believed that the Licensing Agreement only required royalty payments on the Monster Jam models and the Stampede Model 3605/36054 (Mattorano Trial Tr. (8/31/2015) at 3:2-16).

During the term of the License Agreement, Traxxas sent Feld quarterly royalty payment reports (Mattorano Trial Tr. (8/31/2015) at 2:14-3:16; Trial Ex. 408). Mattorano testified that in January 2014, Douglas Edwards ("Edwards") visited Traxxas' offices to conduct an audit (Mattorano Trial Tr. (8/28/2015) at 9:18-9:25). Abernethy testified that Feld asked for the audit based upon the audit provision language in the License Agreement (Abernethy Trial Tr. (8/26/2015) at 82:19-84:12). Abernethy testified that it was after Edwards conducted his audit

that Feld believed Traxxas had not paid Feld its due amount of royalties (Abernethy Trial Tr. (8/26/2015) at 104:11-108:7).

## LEGAL STANDARD

"A motion for judgment as a matter of law… in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Ford v. Cimarron Ins. Co., Inc.*, 230 F.3d 828, 830 (5th Cir. 2000) (quoting *Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998) (quoting *Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997)) (internal citations omitted). Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." FED. R. CIV. P. 50(b). Therefore, a movant may file a renewed judgment as a matter of law, which may include an alternative or joint request for a new trial under Rule 59, "[n]o later than 28 days after the entry of judgment." *Id.*. "[A] jury verdict must be upheld, and judgment as a matter of law may not be granted, unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.'" *Fractus, S.A. v. Samsung Elec. Co., Ltd.*, 876 F. Supp. 2d 802, 813 (E.D. Tex. 2012) (citing *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995)). The jury's verdict must be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004).

"A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury." *Fractus*, 876 F. Supp. 2d at 813;

*see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-151 (2000). "The moving party is entitled to judgment as a matter of law, 'only if the evidence points so strongly and so overwhelmingly in favor of the [] moving party that no reasonable juror could return a contrary verdict.'" *SSL Servs., LLC v. Citrix Sys., Inc.*, 940 F. Supp. 2d 480, 486 (E.D. Tex. 2013) (quoting *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (alteration in original, citation omitted)).

"The court may, on motion, grant a new trial on all or some of the issues[.]" FED. R. CIV. P. 59(a)(1). "[I]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (citation omitted). In ruling on a motion for new trial, the jury's verdict may not be lightly set aside. *See Ellis v. Weasler Eng'g, Inc.*, 258 F.3d 326, 343 (5th Cir. 2001) ("[C]ourts 'must attempt to reconcile the jury's findings, by exegesis, if necessary, before we are free to disregard the jury's verdict and remand the case for a new trial.'"). "In considering whether the seemingly inconsistent verdicts may be reconciled, the court must view the evidence in the light most favorable to upholding the jury's decision by a finding of consistency." *Id; see Hiltgen*, 47 F.3d at 701.

A Rule 59(e) motion "calls into question the correctness of a judgment." *Templet v. HydroChem Inc.*, 367 F.3d 473, 478 (5th Cir. 2004) (quoting *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)). The Fifth Circuit "has held that such a motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Id.* at 479 (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)). A motion to alter or amend judgment may be granted on grounds including: (1) an intervening change in controlling law; (2) the availability of new evidence not

previously available; or (3) the need to correct clear error or manifest injustice. *See In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002). Although courts have a great deal of discretion in ruling on a 59(e) motion, it is "an extraordinary remedy that should be used sparingly[.]" *Templet*, 367 F.3d at 479.

## ANALYSIS[1]

### Renewed Motion for Judgment as a Matter of Law

Traxxas requests that the Court enter judgment against Feld for the following reasons: (1) Traxxas' subsequent conduct is proof of its intent to include only the Stampede Model 3605/36054 under the License Agreement; (2) there is no evidence that Traxxas intended to include the Stampede 4x4 VXL or Stampede 4x4 under the License Agreement; (3) Feld did not intend to include either the Stampede 4x4 VXL or the Stampede 4x4 under the License Agreement; (4) the jury's award creates an improper windfall; (5) the royalty rate clause is triggered by the manufacturing process not the brand; and (6) there is no evidence that Abernethy's use of "Stamped line" meant the "Stampede line." (*See* Dkt. #168).[2]

---

[1] As a preliminary matter, the parties agree that New York law controls this diversity action under the terms of the License Agreement. "When the laws of two or more states may apply to the various claims in a federal diversity action, the court must apply the choice of law rules of the forum state." *Quicksilver Res., Inc. v. Eagle Drilling, LLC*, 792 F. Supp. 2d 948, 951 (S.D. Tex. 2011) (citing *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004)). Therefore, Texas choice of law rules determine which law applies to each claim in the present case. Generally, Texas law gives effect to contractual choice of law provisions. *Quicksilver Res., Inc.*, 792 F. Supp. 2d at 951; *see Caton v. Leach Corp.*, 896 F.2d 939, 942 (5th Cir. 1990); Restatement (Second) of Conflict of Laws § 187 (1971). Therefore, based upon the language of the License Agreement, the Court will apply New York law when determining Traxxas' Renewed Judgment as a Matter of Law Motion, its Motion for New Trial, and its Motion to Amend/Modify the Judgment (Trial Ex. 11 at p. 10 ¶ 25).

[2] Traxxas cites to *Kevin M. Ehringer Enterprises, Inc. v. McData Services Corp.*, 646 F.3d 321 (5th Cir. 2011), for the proposition that judgment as a matter law should be granted in favor of Traxxas. 646 F.3d at 327 n. 3. However, the Court finds that this case does not support Traxxas' contention for the following reasons: (1) the case involves a fraudulent inducement claim under Texas law, whereas this case involves a breach of contract case under New York law; (2) the fraudulent inducement case considered whether evidence of intent to perform the contract was provided during trial, which is completely unrelated to the present case. Additionally, Traxxas cites to *Catlin Specialty Insurance Co. v. QA3 Financial Corp.*, 36 F. Supp. 3d 336 (S.D.N.Y. 2014), for the proposition that when a contract is ambiguous, the fact finder must determine the parties' intent. 36 F. Supp. 3d 341-42. In the present case, the jury verdict form specifically asked the jury to determine if Feld proved the parties' intent. (Dkt. #162 at p. 1) (Did Feld Motor Sports, Inc....prove by a preponderance of the evidence, that in addition to Monster Jam products and Stampede Model 3605/36054, the parties intended the License Agreement to include the following

*Jury's Determination of the Parties' Intent of the License Agreement*

First, Traxxas asserts the following: (1) there is no evidence that Traxxas intended to include the Stampede 4x4 or the Stampede 4x4 VXL in the License Agreement; (2) there is no evidence that Feld intended to include the Stampede 4x4 or the Stampede 4x4 VXL in the License Agreement; (3) Traxxas' subsequent conduct demonstrates its intent to include only the Stampede Model 3605/36054 in the License Agreement; (4) the royalty rate was triggered by the manufacturing process; and (5) Abernethy's use of "Stamped line" is not the "Stampede Lineup." (Dkt. #168).[3]

First, Traxxas asserts that there was no evidence presented that Traxxas intended to include the Stampede 4x4 or Stampede 4x4 VXL in the License Agreement. Specifically, Traxxas argues that the Stampede 4x4 VXL was announced to the public on October 21, 2010, almost a month after Traxxas entered into the License Agreement (Dkt. #168 at p. 3). Traxxas also contends that there was no evidence presented that Feld intended to include the Stampede 4x4 or Stampede 4x4 VXL in the License Agreement (Dkt. #168 at pp. 5-6).

---

Stampede models when calculating royalties? Answer "Yes" or "No."). To the extent that Traxxas is arguing that the Court erred by not including a contra proferentem instruction, Traxxas did not argue that one was needed at the time of trial or during the jury charge conference. Additionally, the Court finds that based upon the reading of *Catlin Speciality Insurance Co.*, the instruction would not apply in the present case. *See* 36 F. Supp. 3d at 342. ("[C]ontra proferentem did not apply in this case because QA3 was a sophisticated party that negotiated the terms of the insurance policy. Contra proferentem does not apply where contracts are negotiated by sophisticated parties of equal bargaining power." (citations omitted)). In the present case, both Feld and Traxxas were sophisticated parties; therefore, the contra proferentem instruction would not apply.

[3] As a preliminary matter, Traxxas argues that "[i]n order to find in favor of [Feld], the jury was required to find that [Feld] proved beyond a preponderance of the evidence that Traxxas and [Feld] intended the License Agreement to not only include the Stampede, but also the Stampede VXL, the Nitro Stampede, the Stampede 4x4 VXL, and the Stampede 4x4." (Dkt. #168 at pp. 1-2). The Court finds that Traxxas misstates Feld's burden of proof. A plaintiff's burden is to prove its case by a preponderance of the evidence, not beyond one. The jury was likewise correctly instructed on Plaintiff's burden by the Court in the Final Jury Charge, which stated the following:

> Plaintiff Feld Motor Sports, Inc….has the burden of proving its case by a preponderance of the evidence. To establish by a preponderance of the evidence means to prove something is more likely so than not so. If you find that Feld Motor Sports has failed to prove any element of its claim by a preponderance of the evidence, then it may not recover on that claim.

(Dkt. #160 at p. 2).

Feld asserts that the evidence of the parties' negotiations, as well as the License Agreement itself, demonstrates that the parties' intent was to include the entire Stampede Lineup within the royalty rate calculation, including the Stampede 4x4 and the Stampede 4x4 VXL, which were not in production at the time of entering the License Agreement (*See* Dkt. #173 at pp. 4-6). Feld also asserts that "the jury heard evidence that definitively proved the parties' intent to include every Stampede model when calculating royalties." (Dkt. #173 at p. 2).

To recover for breach of contract under New York law, a plaintiff must prove (1) the existence of a contract between Plaintiff and Defendant; (2) adequate performance of Plaintiff's obligations; (3) breach of the contract by Defendant; and (4) damages to Plaintiff caused by Defendant's breach. *Casolaro v. Armstrong*, No. 10-CV-4276 (PKC), 2014 WL 7370025, at *5 (E.D.N.Y. Dec. 29, 2014) ("Casolaro I"); *see Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011); *Casolaro v. Armstrong*, No. 10-cv-4276(DRH)(ETB), 2012 WL 6093778, at *2 n. 1 (E.D.N.Y. Dec. 7, 2012) ("Casolaro II").

"Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide.' Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Maniolos v. United States*, 741 F. Supp. 2d 555, 566 (S.D.N.Y. 2010) (quoting *Alexander & Alexander Serv. Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (citations omitted); *accord, e.g.*, *W.W.W. Assoc., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) ("Whether or not a writing is ambiguous is a question of law to be resolved by the courts."); *Sutton v. E. River Sav. Bank*, 435 N.E.2d 1075, 1077 (N.Y. 1982) ("the threshold decision on whether a writing is ambiguous is the exclusive province of the court."). Therefore, "[i]n reviewing a written contract, a trial court's primary objective is to give effect to the intent of parties as revealed by the language they chose to use."

*Casolaro I*, 2014 WL 7370025, at *5 (quoting *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (citing *Slatt v. Slatt*, 477 N.E.2d 1099, 1100 (N.Y. 1985)). Therefore, under New York law, "the Court must first determine whether the language of the written contract is clear or ambiguous." *Id.*; *see Seiden Assoc., Inc.*, 989 F.2d at 429; *see also JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) ("the question of whether a written contract is ambiguous is a question of law for the court.").

"The cardinal principal for the construction and interpretation of [ ] contracts…is that the intentions of the parties should control." *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Prop., LLC*, 467 F.3d 107, 125 (2d Cir. 2006) (quoting *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986)). "Under New York law, '[w]hen the intent of the parties can fairly be gleaned from the face of the instrument, the plain words of the contract govern, and matters extrinsic to the agreement may not be considered.'" *In re Holocaust Victim Assets Litig.*, 256 F. Supp. 2d 150, 153 (E.D.N.Y. 2003) (quoting *RJE Corp. v. Northville Indus. Corp.*, 198 F. Supp. 2d 249, 262 (E.D.N.Y. 2002) (internal quotation marks omitted)). However, if the contract's language is "susceptible to differing interpretations, each of which may be said to be as reasonable as another…the meaning of the words becomes an issue of fact[.]" *Casolaro I*, 2014 WL 7370025, at *5 (quoting *Seiden Assocs.*, 959 F.2d at 428 (citations omitted)); *see In re Holocaust Victim Assets Litig.*, 256 F. Supp. 2d at 153 ("A contract is ambiguous where its terms suggest more than one meaning when viewed objectively by a reasonably knowledgeable person who has examined the context of the entire integrated agreement.") (citations omitted).

To resolve an ambiguity, the Court considers extrinsic evidence to determine the parties' intent. *Casolaro I*, 2014 WL 7370025, at *7; *see JA Apparel Corp.*, 568 F.3d at 397 ("[W]here the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly

be considered."). "Where there is such extrinsic evidence, the meaning of an ambiguous contract is a question of fact for the factfinder." *JA Apparel Corp.*, 568 F.3d at 397. "Courts have considered testimony offered by the parties, the parties' course of conduct and dealing, and post-contract conduct to determine the parties' intent." *Casolaro I*, 2014 WL 7370025, at *7; *see Diesel Props. S.r.l.*, 631 F.3d at 51 (stating factfinder may consider party testimony); *CDR-Wantagh, Inc. v. Shell Oil Co.*, No. 07-CV-4497, 2011 WL 6371582, at *10 (E.D.N.Y. Dec. 20, 2011) ("To determine intent, the court should look to the contract as a whole and the parties' conduct, as well as any evidence of surrounding facts and relevant circumstances, industry custom and practice, and course of dealing.")(citation omitted).

As a preliminary matter, the Court has found the License Agreement to be ambiguous, and thus, the meaning of the License Agreement is a question for the trier of fact. *See JA Apparel Corp.*, 568 F.3d at 397; *see also* Dkt. #160 at pp. 6-7; Dkt. #118 at p. 4). At trial, Abernethy and DeWitt[4], who were negotiators for Feld and Traxxas, testified that the companies' relationship was designed to increase sales of the Stampede brand, not one individual model (DeWitt Trial Tr. at 94:11-18; Abernethy Trial Tr. (8/26/2015) at 5:19-6:4). Abernethy testified that he intended all models to be included because "a Stampede is a Stampede is a Stampede." (Abernethy Trial Tr. (8/26/2015) at 157:3-5; *see* Abernethy Trial Tr. (8/26/2015) at 39:4 ("Stampede is anything that's branded as Stampede."); 156:19-20 ("I didn't know to distinguish each one as individual vehicles."). DeWitt testified that the Traxxas negotiators were "talking about the Stampede line" and "none of us [referring to Jenkins, Mattorano, Poteet, and DeWitt]

---

[4] In its motion, Traxxas describes DeWitt as "a disgruntled, former Traxxas employee who admittedly hates Traxxas and its leadership." (Dkt. #168 at p. 3). However, the Court finds that Traxxas' characterization of DeWitt is irrelevant to its judgment as a matter of law motion because the jury, not the Court, determines credibility of the witnesses, and the weight to give DeWitt's testimony. *See Fractus, S.A.*, 876 F. Supp. 2d at 813 ("A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury.").

that I recall ever spoke of any of the breakdowns of the vehicle." (DeWitt Trial Tr. at 97:11-21).

Additionally, Jenkins[5] testified that through its relationship with Feld, Traxxas was hoping to be able to sell more of its product, not just a particular model (Jenkins Trial Tr. at 52:16-25).

Additionally, the trial record is replete with voluminous testimony and evidence that the parties intended to include the entire Stampede Lineup within the License Agreement. For example, the parties' discussions indicated that they were negotiating over an entire brand, not a specific model. During negotiations, Abernethy repeatedly referred to the "Stamped line."[6] (Trial Ex. 22) ("This takes into consideration that Traxxas will be converting the Stamped line of R/C vehicles 100% to Monster Jam branded vehicles….If the Stamped line off [sic] R/C vehicles does not currently sell 30,000 units per year, then we'll need to re-adjust."); (Trial Ex. 24) ("The Stamped line of R/C's will be converted to MJ branded vehicles."); (Trial Exs. 18, 25).[7] Traxxas did not dispute this description. (*See* Abernethy Trial Tr. (8/26/2015) at 39:11-14 ("[Q.] Had you heard anything from Traxxas that had walked that [Abernethy's reference to Stampede line] back and said we're not talking about a Stampede line anymore? A. No, never."); *see also* Trial

---

[5] In its reply brief, Traxxas argues that Jenkins did not participate in any negotiations over the terms after July 28, 2010; however, Mattorano testified that prior to his involvement Jenkins was the "ultimate decision maker[,]" and even when Mattorano was serving as the primary negotiator he "kept [Poteet and Jenkins] informed and discussed different changes with them to [the] agreement." (Mattorano Trial Tr. (8/28/2015) at 26:24-27:12). Therefore, the Court finds that Jenkins' testimony is relevant as to Traxxas' intent when negotiating over the License Agreement.

[6] Traxxas asserts in its motion that the "Stamped line" does not necessarily refer to the Stampede Lineup because "there is no evidence in the record that Abernathy [sic] understood that phrase to include the Stampede Lineup, or that he communicated that intent to Traxxas." (Dkt. #168 at pp. 7-8). During his testimony, Abernethy stated that the word "Stamped" in his email exhanges with Traxxas meant "Stampede." (Abernethy Trial Tr. (8/25/2015) at 16:8-12). As Traxxas did not object or present evidence to the contrary, the Court finds that the "Stamped line" was the same as the Stampede Lineup.

[7] In its motion, Traxxas asserts that Feld "cannot bootstrap prior negotiations (i.e. Mr. Abernethy's unwitting use of 'Stamped line') that are inconsistent with express provisions of the License Agreement ('the Stampede'), even under an ambiguity analysis." (Dkt. #168 at p. 8). Traxxas cites to *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 517 (2d Cir. 2001), for the proposition that parol evidence is not admissible when inconsistent with express contract provisions (Dkt. #168 at p. 8 n. 33). At trial, Traxxas did not object on this ground to the emails that Feld introduced, which included evidence of the Stampede Lineup and other evidence. Additionally, the Court finds that *Golden Pacific Bancorp* is inapplicable to the present case. Feld's evidence regarding prior negotiations, including Mr. Abernethy's use of "Stamped line," is not inconsistent with the express contract provisions, as the Court found the contract was ambiguous, and the jury was charged with determining whether the License Agreement included the Stampede Lineup or only the Stampede Model 3605/36054 (*See* Dkt. #160 at pp. 6-7).

Ex. 25 (Abernethy refers to "Stamped line" in email to Poteet, Poteet forwards email to Jenkins, Jenkins responds, "[a]dd Stampede sales in to a total to get to the 30k[,]" but does not address Abernethy's use of "Stamped line."). Poteet also referred to "these Stampedes" in an email conversation to Abernethy during negotiations for the License Agreements (*See* Trial Ex. 19 at p. 1) ("Hobby products? Well, we didn't design for high licensing costs. Selling more units doesn't help much if we can't maintain the tiny bit of profitability we have left on these Stampedes."). Jenkins also testified that the "Stampede line" would include each Stampede model (*See* Jenkins Trial Tr. at 53:6-16 ("Q. And I think with respect to the Stampede, there's a line of Stampede vehicles, right? A. Yes. Q. And that line, that includes…the Stampede, there's a brushless Stampede, there's a 4x4 brushless Stampede, a Nitro Stampede and a Stampede 4x4[?]…A. Currently, yes."); *see also* Jenkins Trial Tr. at 65:6-15 ("Q. Will you turn to Exhibit 249…[D]o you have an understanding of what's being represented in the row labels across the top where it says Stampede, VXL, Nitro, 4x4 VXL, 4x4 brushed and total? A. Yes, this our line of Stampedes."); Jenkins Trial Tr. at 74:11-16 ("Q. When you created this…Stampede 4x4 VXL, you called that a Stampede, right? A. We called it a Stampede 4x4 VXL, yes. Q. You put it in the Stampede line of vehicles? A. Yes, it's in the Stampede line of vehicles.")).

Traxxas also contends that Feld's "lack of intent to include the Stampede Lineup is conclusively evidenced by the absence of 'Stampede line' or 'Stampede lineup' in any version of the draft License Agreement, or Mr. Abernethy's internal discussions within [Feld] after September 2, 2010." (Dkt. #168 at p. 8). During the course of negotiating the License Agreement, the parties exchanged multiple drafts; however, neither Feld nor Traxxas ever modified the language "whether or not branded with the Property or 'Stampede.'" (*See* Trial Ex.

11 at p. 11 ¶ 5); Trial Exs. 39, 215, 216, 217, 218, 219).[8]  Additionally, Mattorano, who drafted

the License Agreement for Traxxas and was considered the "legal eyes[9]," insisted that Feld add

paragraph 13(h) to the License Agreement, which allowed Traxxas to terminate the License

Agreement if "total sales of the Stampede-branded R/C Vehicle Units do not meet or exceed

30,000 units in any one year."   (Trial Ex. 11 at p. 7 ¶ 13(h); *see* Trial Ex. 217 at p. 2 ("I

[Mattorano] added a provision whereby we can cancel the contract.  Here is why.  The business

purpose of this relationship is that your IP will provide incremental sales.  If these incremental

sales do not occur we should have the right to cancel or get out of a failed relationship."); *see*

*also* Abernethy Trial Tr. (8/26/2015) at 46:16-48:1) ("What Mr. Mattorano is asking for is some

termination language that could go into the agreement in the event that the sales from this

relationship did not surpass 30,000 units.").  Additionally, when devising the royalty calculation,

Jenkins told Poteet to "[a]dd Stampede sales in a total to get to the 30k," and Traxxas' sales

records demonstrate that "Stampede sales" refer to all Stampede models together (Trial Exs. 25,

249; Jenkins Tr. Transcript at 65:6-66:4).  Additionally, Jenkins testified that nothing in the

parties' negotiations or the License Agreement would explicitly limit royalties to Stampede

Model 3605/36054 only (Jenkins Trial Tr. at 92:14-22).

The testimony also proved that the parties' intention when using broad and inclusive

language in the royalty provision was to protect Feld, and that the royalty provision would

include any additional Stampede models, like the Stampede 4x4 VXL and Stampede 4x4

---

[8] Traxxas asserts that Feld "abandon[ed] any pretense of payment on the 'Stamped[e] line'" because its attorney and a drafter of the License Agreement, Emily Roisman, used the phrase "manufactured with the Stampede chassis and/or Stampede body" (Dkt. #168 at p. 8).  The Court finds that Traxxas is only using Ms. Roisman's position within Feld at the time of License Agreement to further buttress its argument that the License Agreement only included the Stampede Model 3605/36054.  However, to the extent that Traxxas is asserting that Ms. Roisman should have testified, the Court finds that to be irrelevant to its determination of Traxxas' motion for judgment as a matter of law.  *See Paez v. Gelboym*, 578 F. App'x 407, 408 n. 1 (5th Cir. 2015) (per curiam) ("We do not consider evidence that was not present to the jury.").
[9] *See* DeWitt Trial Tr. at 49:19-51:4; *see also* Jenkins Trial Tr. at 76:9-18.

introduced by Traxxas after the License Agreement was signed (Abernethy Trial Tr. (8/26/2015) at 66:2-15) (testifying that a new Stampede model released after the License Agreement was signed would be included in the royalty calculation.). Jenkins also testified that the License Agreement

> protects [Feld] from us…giving them potentially an old chassis design that's been around since 1994, and us…being sneaky, coming out with a Stampede 2 chassis design and putting our Stampede body on that and saying, here's the new Stampede. And had we have done something like that…then…that's protection for that so that those would be counted as well. That would then capture, you know, maybe it didn't have a Stampede chassis. Maybe it had this new Stampede II chassis, but if it had the Stampede body that we wanted to carry that identity forward. And that was my interpretation of that language.

(Dkt. #173, Exhibit D at 219:3-219:19; *see* Jenkins Trial Tr. at 82:11 (Deposition testimony was played)).[10] During the term of the License Agreement, Traxxas released two new models to the Stampede Lineup—the Stampede 4x4 and the Stampede 4x4 VXL. Although Dewitt testified that he did not intend to include the Stampede 4x4 VXL or Stampede 4x4 under the License Agreement, he testified that Traxxas did not differentiate between the vehicles in its negotiations with Feld. (*See* DeWitt Trial Tr. at 135:14-136:22).

Traxxas also asserts that it lacked the intent to include the entire Stampede Lineup in the Licensing Agreement (Dkt. #168 at p. 3). Feld asserts that Traxxas cannot rely upon its own intent because there is overwhelming evidence that it never communicated any such intent to Feld, and New York case law states that uncommunicated subjective intent cannot supply a contract's meaning (Dkt. #173 at p. 7). Feld argues that "[t]he testimony proved that Traxxas never expressed any intention to exclude any of the Stampede models from the royalty

---

[10] The jury was able to consider this testimony for its substance as a statement of a party opponent under Federal Rule of Evidence 801(d)(2), and also as a prior inconsistent statement under Federal Rule of Evidence 801(d)(1), as Jenkins initially tried to backtrack from the sworn deposition statement during trial.

calculation, and that even if Traxxas possessed such intent, [Feld] never knew it." (Dkt. 173 at p. 7).

To determine the parties' intent, courts look to "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *SR Int'l Bus. Ins. Co., Ltd.*, 467F.3d at 125 (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977)). "The parties' communicated expressions are interpreted objectively to give effect to the 'reasonable expectations' of the parties, not necessarily their actual expectations." *SR Int'l Bus. Ins. Co., Ltd.*, 467 F.3d at 125 (quoting *Brown Bros. Elec. Contractors, Inc.*, 361 N.E.2d at 1001); *see also Mencher v. Weiss*, 114 N.E.2d 177, 181 (N.Y. 1953)). A party's uncommunicated subjective intent, however, cannot supply the ultimate meaning of an ambiguous contract. *SR Int'l Bus. Ins. Co., Ltd.*, 467 F.3d at 125. But "a party's subjective understanding, while not controlling, may shed light on the state of [the] negotiations and could bear on [a] party's objective actions." *Id.*

The testimony proved that Traxxas never expressed any intention to exclude any of the Stampede models from the royalty calculation to Feld during negotiations. (*See* Abernethy Trial Tr. (8/26/15) at 55:6-14 ("[Q.] [W]ere [you] ever told from Traxxas that they wanted to…exclude any Stampede models from the royalty rate calculation? A. They did not.")). Abernethy testified that at the time of entering the License Agreement in September 2010, he knew of "Stampede," but he did not know the specific Stampede models, including the 3605/36054 (Abernethy Trial Tr. (8/26/2015) at 219:15-220:5; 222:4-223:8). Additionally, Abernethy testified that if he had known about the model qualifiers, such as VXL, Nitro, or 4x4, he would have considered them included within the License Agreement as it was written (Abernethy Trial Tr. (8/26/2015) at 222:24-223:8). Abernethy also testified that Feld was never

informed of Traxxas' limited meaning of the term "Stampede." (Abernethy Trial Tr. (8/26/2015) at 3:13-7:9). DeWitt confirmed that he never told Feld that "Stampede" referred to only Stampede Model 3605/36054. (DeWitt Trial Tr. at 38:3-18). Additionally, Jenkins saw Abernethy's references to the "Stamped[e] line," and never corrected them (*See* Trial Ex. 25).

Additionally, even if Traxxas possessed the intent to only include the Stampede Model 3605/36054, Feld never knew about it. (DeWitt Trial Tr. at 54:15-55:6). Additionally, Poteet was repeatedly unable to explain how Feld or anyone outside of Traxxas would know that within Traxxas, "the Stampede" referred only to Stampede Models 3605/36054 (Poteet Trial Tr. 2:18-3:6, 3:9-4:19). Poteet testified that a hobby dealer would have to "educate" Feld about "the feature sets of the different models and the price points of the different models." (Poteet Trial Tr. at 4:5-7). Poteet also testified that a search for "Stampede" on Traxxas' website might reveal Traxxas' understanding of the word; however, the evidence that was admitted during trial demonstrated that an actual search of Traxxas' website for "Stampede" displayed every model in the Stampede Lineup. (Poteet Trial Tr. at 10:9-23; Trial Ex. 205).

Traxxas also argues that the 30,000-unit threshold reflected the parties' intention to limit Feld's royalties to a single Stampede model (Dkt. #168 at p. 2 n. 5). During the trial, DeWitt testified, and Abernethy agreed, that the 30,000 number referred to the 2009 past sales rather than the 2010 projections, and would include all Stampede models (Abernethy Trial Tr. (8/26/2015) at 14:17-18 ("[T]hey told us they sell 30,000 units per year of Stampede. Sales meaning it has happened."); DeWitt Trial Tr. at 43:25-44:5 (describing DeWitt's method of giving the prior year of sales to customers); 121:5-21 (describing that the 30,000 number would include anything with the Stampede name that was available); 128:25-129:17; 141:12-15: 144:1-15; 167:17-168:20 (referring to Trial Ex. 249, reflecting 2009 sales of all Stampedes at 26,263

units)).  Abernethy also testified during trial that Feld never had access to Traxxas' sales figures (Abernethy Trial Tr. (8/26/2015) at 92:24-93:4 ("[W]e do not have access to those records or books.")).  Therefore, even if Traxxas intended the 30,000 figure to include only the Stampede Model 3605/36054, Feld had no way of knowing that the number would have excluded the other Stampede models.

Traxxas also asserts that Feld's "testimony consistently demonstrate[s] it only knew of the Stampede with a wholesale price point of $150-$160." (Dkt. #168 at p. 5).  Specifically, Traxxas asserts that because the Stampede Model 3605/36054 is the only model in the Stampede Lineup with a wholesale price of $150, Feld only intended to include the Stampede Model 3605/36054 in the License Agreement (Dkt. #168 at p. 5).  Abernethy testified that in his discussions with Poteet he was told that the Stampedes' "[w]holesale [price] is about 150 to 160 a unit." (Abernethy Trial Tr. (8/26/2015) at 131:13-18).  Abernethy also testified that during his July 7th discussion, the only price point mentioned was the wholesale price point of $150 to $160.  (Abernethy Trial Tr. (8/26/2015) at 157:12-20) ("[Q.] All the Stampedes that you knew about, Mr. Abernethy, did they all have wholesale numbers of 150 to $160?  A. The ones that were talked about on July 7th were 150 to 160.  That's what I knew about.  I knew it was Stampede vehicles.  Q. And that's the only ones you knew about, right?  A. I didn't distinguish between anything.  They're all Stampedes.").  However, Abernethy also asserted that this didn't stop the wholesale price from going up.  (*See* Abernethy Trial Tr. at 131:19-132:10).  This is also evidenced within the License Agreement itself, which states, "**R/C Vehicle Units** must maintain a *minimum wholesale cost* of One Hundred Dollars ($100.00) (Trial Ex. 11 at p. 12 ¶ 14) (emphasis added).

Traxxas argues that "[w]hether a vehicle or body is manufactured with 'the Stampede chassis' or the 'Stampede body' is the determining factor." (Dkt. #168 at p. 9). The Licensing Agreement contains language that states the following:

> 5. **Royalty Rate**: In determining the number of **Licensed Articles** on which Licensor will receive royalties, **"Licensed Articles"** shall be deemed to include **all R/C Vehicle Units and R/C Bodies** manufactured with the Stampede chassis and/or Stampede body, **whether or not branded with the Property or "Stampede."**

(Trial Ex. 11 at p. 11 ¶ 5) (emphasis in original). Mattorano testified that the Stampede Models 3605 and the 3605-4 were included in royalty payments because they were "manufactured on the Stampede chassis and with a Stampede body." (*See* Mattorano Trial Tr. (8/31/2015) at 6:10-7:9).

However, Feld asserts that each body within the Stampede Lineup fits on the Stampede Model 3605's chassis. Because each body fits on the Stampede 3605's chassis, the Licensing Agreement "and/or" language requires payment on all of the models within the Stampede Lineup. Examples of every model within the Stampede Lineup were introduced into evidence, and DeWitt demonstrated during his testimony how the body of each Stampede model fits on the Stampede Model 3605's chassis (Trial Exs. 501A-B, 502, 503, 504, 505; *see* DeWitt Trial Tr. at 176:21-180:20; 184:5-11; 187:20-188:1). The jury also was presented with Traxxas' press release announcing the Stampede 4x4 VXL, which stated that "the Stampede 4x4 VXL's body, [] is interchangeable with the 2WD Stampede body (and all aftermarket bodies as well.)" (Trial Ex. 302). Additionally, the jury heard testimony that the bodies are manufactured identically. Poteet testified that "[t]he Stampede VXL, Stampede, and the Stampede 4x4 and Stampede 4x4 VXL, those bodies do use the same vacuum forming tool in the manufacturing process." (Poteet Trial Tr. at 6:22-24). He further testified that the only differences were "minor cosmetic details."

(Poteet Trial Tr. at 10:3-8).  Jenkins also testified that "[a]ll of the Stampedes are made from the same body tool…."  (Jenkins Trial Tr. at 75:17-23).

Feld asserts that the jury also properly read Paragraph two of the License Agreement as not limiting Feld's royalties to only battery-operated vehicles (Dkt. #173 at p. 9).  Paragraph two of the License Agreement states the following:

> 2.  **Licensed Articles:**  Hobby-grade battery-operated remote control operated monster trucks (**"R/C Vehicle Units"**) and monster truck vehicle bodies (**"R/C Bodies"**) branded with the **Property**.  Licensed Articles shall include a minimum of four (4) different monster truck molds of **R/C Bodies** each year, for each year during the Term other than 2010.

(Trial Ex. 11 at p. 11 ¶ 2) (emphasis in original).  Traxxas asserts that "[u]nder the plain language "R/C Vehicle Units" cannot be fuel operated…" (Dkt. #168 at p. 13).  Traxxas also argues that Mattorano testified that the Nitro Stampede would be excluded from the License Agreement because it is gas powered (*See* Mattorano Trial Tr. (8/31/2015) at 10:3-25).  Feld asserts that Paragraph two and Paragraph five of the License Agreement serve separate roles, and must be read separately (*See* Dkt. #173 at p. 9).  Specifically, Feld argues that "[t]he plain language of Paragraph 2 defines which Traxxas products will bear [Feld's] property, whereas by contrast, Paragraph 5 sets out the method for calculating royalties."  (Dkt. #173 at p. 9; *see* Trial Ex. 11 at p. 11 ¶¶ 2, 5; Abernethy Trial Tr. (8/27/2015) at 7:18-8:6).  Additionally, although originally Jenkins asserted that the two paragraphs serve the same purpose in the License Agreement, he then agreed that the two paragraphs served separate roles (Jenkins Trial Tr. at 79:12-80:14 ("Q. And you're not going to look to that provision [Paragraph 5] to determine what can I put on a—what can I use the Monster Jam product on.  That's what you look to calculating royalties?  A.  That's correct.")).

The Court finds that Mattorano's testimony is consistent with that of Abernethy and Jenkins. Although Mattorano stated that "gas operated vehicles were ruled out early in the negotiations[,]" Mattorano was discussing whether or not gas operated products could be licensed articles under Paragraph two of the License Agreement (Mattorano Trial Tr. (8/31/2015) at 10:11-15). At no time during his testimony did Mattorano testify that Paragraphs two and five of the License Agreement were not separate clauses, as stated by Abernethy.

Traxxas argues that its subsequent conduct is proof of its intent to include only the Stampede Model 3605/36054 under the License Agreement. Specifically, Traxxas asserts that because it only paid on Stampede Model 3605/36054, as demonstrated in its quarterly royalty payment reports, the parties' intent was to only include payments on Stampede Model 3605/36054 (Dkt. #168 at pp. 2-3; *see* Trial Ex. 408).

Traxxas points to *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 264 (2d Cir. 1965), to show that the parties' subsequent conduct is relevant to the determination of the parties' intent when forming the License Agreement. In *Gordon*, the Second Circuit found that "[w]here ambiguity is present in a contract, the subsequent conduct of the parties may be used to indicate their intent." 358 F.2d at 264. Traxxas seems to rely upon the case for its citation of *Seymour v. Warren*, 71 N.E. 260 (N.Y. 1904), which states, "[t]here is no better way of ascertaining the meaning and construction of a written contract than to look at the acts and conduct of the parties under it." 71 N.E. at 261. However, the question in *Seymour* was whether a letter memorializing an unwritten contract stated the terms clearly enough to satisfy the statute of frauds, and the court considered the parties' subsequent conduct as proof that the contract was accepted and supported by adequate consideration. *See* 71 N.E. at 260-62. Although the Court finds that the exact

scenario in *Seymour* is irrelevant to the present case, the Court finds that Traxxas' subsequent conduct argument still holds some bearing to determining the ambiguous contract.[11]

In the present case, Traxxas contends that its subsequent conduct demonstrates that Traxxas intended to pay only on the Stampede Model 3605/36054 (Dkt. #168 at pp. 2-3). Traxxas argues that the quarterly payment reports that were sent to Feld demonstrate their intent as they include eighty-two (82) references to the Stampede Model 3605/36054 over a three-year period (Dkt. #168 at p. 3 n. 8; Trial Ex. 408). Additionally, Traxxas asserts that the payment reports show the parties' intent because Mattorano, who was a negotiator for the License Agreement[12], set up Traxxas' accounting software to pay on the Stampede Model 3605/36054 (Dkt. #168 at p. 3 n. 8; *see* Mattorano Trial Tr. (8/31/2015) at 2:14-3:16).[13] Additionally, Traxxas asserts that Feld "did not dispute that it knew, or should have known, about the other models in the Stampede Lineup, including the other model numbers (Dkt. #168 at p. 3 n. 9).[14] [15]

---

[11] Traxxas also relies on *Waverly Corp. v. City of New York*, 851 N.Y.S.2d 176, 179 (N.Y. App. Div. 2008). In *Waverly*, the court cited *Barbour v. Knecht*, 743 N.Y.S.2d 483, 488 (N.Y. App. Div. 2002), which cited *Webster's Red Seal Publ'ns, Inc. v. Gilberton World-Wide Publ'ns, Inc.*, 415 N.Y.S.2d 229 (N.Y. App. Div. 1979). But *Webster's Red Seal Publ'ns, Inc.*, involved a "modification implied in fact from the conduct of the parties," and did not announce a rule of construction for interpreting ambiguous contracts. 415 N.Y.S.2d at 230. The other cases cited by Traxxas stand for the proposition that the jury *may* consider the parties' subsequent conduct, but not that the subsequent conduct compels a particular interpretation. *See Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006) ("In determining the meaning of the language at issue, the jury may consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract."); *Casolaro v. Armstrong*, No. 10-CV-4276 PKC, 2014 WL 7370025, at *7 (E.D.N.Y. Dec. 29, 2014) ("Courts have considered testimony offered by the parties, the parties' course of conduct and dealing, and post-contract conduct to determine the parties' intent."); *In re Holocaust Victim Assets Litig.*, 256 F. Supp. 2d 150, 154 (E.D.N.Y. 2003) ("In that regard, 'the subsequent conduct of the parties may be used to indicate their intent.'").

[12] Mattorano, however, testified that he became involved in negotiations "right towards the end to wrap up the agreement, to get it finalized." (Mattorano Trial Tr. (8/28/2015) at 26:11-23).

[13] Feld asserts that "Traxxas left implementation of the deal to its IT department, which created the code for royalty payments, and to its accounting department, which processed the payments." (Dkt. # 173 at p. 10). Mattorano testified during trial that he implemented the accounting software, but he did testify that the royalty reports were prepared by the accounting department, which Mattorano reviewed (Mattorano Trial Tr. (8/31/2015) at 2:14-3:16).

[14] Feld seems to agree that there are different models of R/C Vehicles within the Stampede Lineup. However, the issue in this case, was whether Feld and Traxxas intended the License Agreement to include the entire Stampede Lineup, or to include a single model of the Stampede Lineup—Model 3605/36054, which Feld does oppose (*See* Dkt. #160 at pp. 6-7) ("Because the License Agreement's language is ambiguous, it is your duty to interpret the ambiguous language of the License Agreement. Therefore, in determining whether or not Traxxas breached the License Agreement, you must determine whether the License Agreement requires the royalty payments on the sales

Mattorano also testified that no one from Feld ever contacted him, prior to its audit, to inquire about the missing Stampede models. (Mattorano Trial Tr. (8/31/2015) at 5:5-8). The Court instructed the jury as follows regarding the parties' course of conduct:

> You may also consider the parties' conduct after the contract is formed to determine the intent of the parties. While you may consider a party's subjective intent to gain an understanding of the negotiations and a party's objective actions, you may not substitute a party's subjective intent for the ultimate meaning of the words used in the contract.

(Dkt. #160 at p. 7). The Court also instructed the jury regarding the License Agreement's "no-waiver" provision. The License Agreement stated:

> **23. Modification and Wavier:** This Agreement may not be modified and none of its terms may be waived, except in writing signed by parties. The failure of either party to enforce, or the delay of either party in enforcing, any of its rights shall not be deemed a continuing wavier or a modification of this Agreement.

(Trial Ex. 11 at p. 10 ¶ 23) (emphasis in original). The Court instructed the jury regarding the no-waiver provision as follows:

> The License Agreement contains a "No Waiver" provision. When you make your determinations regarding the breach of the License Agreement, if any, you may not find that either party waived or modified any portion of the agreement, including the right to collect royalties, through a delay in discovering or asserting a breach of the Agreement. If you find that Traxxas improperly excluded one or more Stampede models from its royalty calculations, you must award Feld Motor Sports the full amount of damages due, regardless of when Feld Motor Sports first learned about or first sought to collect unpaid royalties.

---

of the Stampede-branded vehicles, as Feld Motor Sports claims, or requires royalty payments only on the sales of Monster Jam products and Stampede Model 3605/36054, as Traxxas claims.").

[15] In its motion, Traxxas cites to Trial Exhibit 61 as demonstrating that Feld knew, or should have known, that there were different models within the Stampede Lineup. However, after reviewing the Court's record, the Court finds that Trial Exhibit 61 was not admitted during the trial, and therefore will not consider the exhibit when making its determination. *See Fractus, S.A.*, 876 F. Supp. 2d at 813 ("A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are the sole functions of the jury."); *see also Kevin M. Ehringer Enter., Inc.*, 646 F.3d at 325. As Trial Exhibit 61 was not admitted into the record during trial, the Court will not consider it.

(Dkt. #160 at p. 8). Therefore, the Court finds that the evidence regarding Feld's not reporting missing Stampedes to Traxxas prior to conducting its 2014 audit is irrelevant to the jury's determination, as the License Agreement contained a "No-Waiver" clause.

The Court finds that there was sufficient evidence for the jury to determine that the Licensing Agreement included the entire Stampede Lineup—including the Stampede VXL, the Stampede 4x4, the Stampede 4x4 VXL, and the Nitro Stampede (Dkt. #162). Evidence was presented that the companies' relationship was designed to increase the Stampede brand, not just one individual model (DeWitt Trial Tr. at 94:11-18; Abernethy Trial Tr. (8/26/2015) at 5:19-6:4). Additionally, during negotiations with Traxxas, Abernethy repeatedly referred to the "Stamped[e] line," which Traxxas did not correct (Trial Ex. 22) ("This takes into consideration that Traxxas will be converting the Stamped line of R/C vehicles 100% to Monster Jam branded vehicles….If the Stamped line off [sic] R/C vehicles does not currently sell 30,000 units per year, then we'll need to re-adjust."); (Trial Ex. 24) ("The Stamped line of R/C's will be converted to MJ branded vehicles."); (*See* Abernethy Trial Tr. (8/26/2015) 39:11-14) ("[Q.] Had you heard anything from Traxxas that had walked that [Abernethy's reference to Stampede line] back and said we're not talking about a Stampede line anymore? A. No, never."); (*see also* Trial Ex. 25) (Abernethy refers to "Stamped line" in email to Poteet, Poteet forwards email to Jenkins, Jenkins responds, "[a]dd Stampede sales in to a total to get to the 30k[,]" but does not address Abernethy's use of "Stamped line."). Jenkins also testified that the "Stampede line" would include each Stampede model (*See* Jenkins Trial Tr. at 53:6-16) ("Q. And I think with respect to the Stampede, there's line of Stampede vehicles, right? A. Yes. Q. And that line, that includes…the Stampede, there's a brushless Stampede, there's a 4x4 brushless Stampede, a Nitro Stampede and a Stampede 4x4[?]…A. Currently, yes."); (*see also* Jenkins Trial Tr. at 65:6-15)

("Q. Will you turn to Exhibit 249…[D]o you have an understanding of what's being represented in the row labels across the top where it says Stampede, VXL, Nitro, 4x4 VXL, 4x4 brushed and total?  A. Yes, this our line of Stampedes.").

Additionally, evidence was presented during trial that Feld did not abandon its original position that the License Agreement pertained to the entire Stampede Lineup.  Although Traxxas asserts that the language drafted by Feld's attorney does not include the language "Stampede Lineup" or "Stampede Line," the testimony presented during trial demonstrated that Feld believed that the License Agreement language included the entire Stampede Lineup (Abernethy Trial Tr. (8/26/2015) at 157:3-5) ("[A] Stampede is a Stampede is a Stampede."); (Abernethy Trial Tr. (8/26/2015) at 39:4) ("Stampede is anything that's branded as a Stampede."); (Abernethy Trial Tr. (8/26/2015) at 156:19-20) ("I didn't know to distinguish each one as individual vehicles.").  Additionally, Jenkins testified that the parties used broad language in order to protect Feld if Traxxas introduced additional models after entering the License Agreement (Dkt. #173, Exhibit D at 219:3-219:19; *see* Jenkins Trial Tr. at 82:11).  Jenkins also testified that nothing in the parties' negotiations or the License Agreement would explicitly limit royalties to the Stampede Model 3605/36054 (Jenkins Trial Tr. at 92:14-22).

While it is possible that Traxxas intended to only include the Stampede Model 3605/36054 within the License Agreement, the Court finds that Traxxas has not met its burden to demonstrate that "the evidence points so strongly and so overwhelmingly in favor of the [] moving party that no reasonable juror could return a contrary verdict."  *See SSL Servs., LLC*, 940 F. Supp. 2d at 486.  Because Traxxas has failed to meet its burden, the Court finds that Traxxas' motion for judgment as a matter of law should be denied as to the jury's determination of the interpretation of the License Agreement.

*Jury's Determination of Damages*

Traxxas argues that the jury's award constitutes an improper windfall (Dkt. #168 at p. 6). Specifically, Traxxas asserts that "[t]he uncontroverted evidence proved [Feld] never intended to be paid on the Stampede 4x4s, only on the Stampede." (Dkt. #168 at p.6). Traxxas argues that "[t]he absence of evidence of [Feld's] intent to get paid on the entire Stampede Lineup combined with the windfall rule of contract interpretation requires judgment as a matter of law." (Dkt. #168 at p. 7). Traxxas also argues that an improper windfall occurred because Feld tried "to extend the interpretation of 'the Stampede' to include the entire Stampede Lineup." (Dkt. #168 at p. 6).

Feld asserts that "the jury was presented with specific, itemized calculations of unpaid royalties for each Stampede model[.]" (Dkt. #173 at p. 10; *see* Trial Ex. 326). Additionally, Feld asserts that the Court instructed the jury to award damages only on improperly withheld royalties, and Feld's expert Edwards' calculations[16] allowed the jury to calculate those damages (Dkt. #173 at pp. 10-11).

"Under New York law, damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003); *see Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1995); *see also Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 92 (2d Cir. 1984). Damages are measured from the date of the breach. *Oscar Gruss & Son, Inc.*, 337 F.3d at 196; *see Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (N.Y. 1971); *see also Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002). The court should apply reasonable business expectations to construe an agreement in order to prevent

---

[16] Traxxas did not object to Edwards' calculation during trial, nor did Traxxas' expert, Sidney Blum, provide a calculation of his own.

granting a windfall to a party that was not provided for in under the contract. *See Russian Entm't Wholesale, Inc. v. Close-Up Int'l, Inc.*, 767 F. Supp. 2d 392, 407 (E.D.N.Y. 2011); *see also B.P. Air Conditioning Corp. v. One Beacon Ins. Grp.*, 871 N.E.2d 1128, 1133 (N.Y. 2007).[17]

The Court finds that the jury did not award an improper windfall and the evidence at trial clearly supported the damages awarded by the jury. Edwards included damage calculations for the following : (1) under-reported sales and royalties of R/C Vehicles; (2) under-reported sales and royalties of R/C Vehicle Bodies; (3) Monster Jam Units that had been distributed at no cost; (4) interest charges; and (5) reimbursement of royalty audit fees (Trial Ex. 326 at pp. 4-5). Specifically, Edwards' expert report stated as follows:

> For purposes of this report, I have been asked to calculate damages based on the assumption that [Feld] prevails on its claim that the license agreement required Traxxas to pay [Feld] royalties on all of the Stampede R/C vehicle units that Traxxas excluded from its royalty payments.
> When taking into consideration the unreported items, the damages amount due Feld Motor Sports totals $929,433.48. Please refer to Schedules B-1, B-2, and B-3 for the calculation of this amount. Schedule B-4 provides a summary of damages by item.
> […]
> For purposes of this report, I have also been asked to calculate damages based on the assumption that [Feld] prevails on its claim that the license agreement required Traxxas to pay [Feld] royalties on all Stampede R/C bodies that Traxxas excluded from its royalty payments.
> During the audited period, Traxxas sold a total of 15,400 Stampede bodies for $231,249.52. The damages amount due Feld Motor Sports totals $9,805.69. Please refer to Schedules C-1 and C-2 for the calculation of this amount. Schedule C-3 provides a summary of damages by item.
> […]
> For purposes of this assumption, I have been asked to calculate the damages amount associated with the distribution of Monster Jam items free of charge.
> During the audited period, Traxxas shipped a total of 1,021 Monster Jam units at no cost. When the Monster Jam units are valued at the appropriate sales amount,

---

[17] In its motion, Traxxas cites to *BP Air Conditioning Corp. v. One Beacon Insurance Group*, 871 N.E.2d 1128, 1133 (N.Y. 2007), and *Russian Entertainment Wholesale, Inc. v. Close-Up International, Inc.*, 767 F. Supp. 2d 392, 407 (E.D.N.Y. 2011), for the proposition that the jury's damage figure has resulted in an improper windfall towards Feld (Dkt. #168 at p. 6). However, the Court does not find that the cases demonstrate a windfall in the present case, as the jury found that the parties intended for all of the vehicles within the Stampede Lineup to be included under the royalty calculation of the License Agreement (*See* Dkt. #162).

the damages amount totals $3,905.83.  Please refer to Schedules D-1, D-2, and D-3 for the calculation of this amount.

[…]

The Damage Calculations explained above are in excess of the 5% limitation established by the license agreement.[18]  The fees and expenses associated with the Monster Jam royalty audit amount to $12,475.30.

Please refer to Schedule F-1 for a summary of the Damage Calculations and Schedule F-2 for a summary of Damage Calculations by item.

(Trial Ex. 326 at pp. 4-5).  Edwards' expert report also contained itemized tables laying out the various vehicle models and the amounts due if the jury found they were included in the License Agreement (*See* Trial Ex. 326 at Schedules B-1-F-2).  The Court also read the following charge to the jury at the trial:

> If you find Traxxas breached the contract, then you must determine the amount of Feld Motor Sports' damage.  You must place Feld Motor Sports in the same position as if the contract had not been breached.  Feld Motor Sports may recover those damages naturally arising from the breach of contract.  These would include the royalty payments Traxxas was obligated to pay.  You must determine the amount of royalties to which Feld Motor Sports was entitled under the License Agreement.

(Dkt. #160 at p. 9).

The jury found at trial that the parties intended for all of the vehicles within the Stampede Lineup to be included under the royalty calculations of the License Agreement, and awarded Feld $955,620.30 (*See* Dkt. #162).    As the Court has found that there is sufficient evidence for the jury's determination that the License Agreement included the entire Stampede Lineup, including the Stampede VXL, the Stampede 4x4, the Stampede 4x4 VXL, and the Nitro Stampede, the Court finds that the damages assessed by the jury are likewise reasonable based upon Edwards' expert report and damages calculations.   Therefore, the Court finds that the damages do not constitute an improper windfall.

---

[18] The License Agreement contained a clause which states, "If any such audit shall disclose any deficiency of five percent (5%) or more, Licensee shall pay, in addition to such deficiency, the actual and reasonable cost of such audit."  (Trial Ex. 11 at p. 2 ¶ 4(e)).

*Motion for New Trial*

Traxxas requests that the Court grant a new trial under Rule 59(a) because the jury's verdict was against the great weight of the evidence. Traxxas argues that there was "no evidence that Traxxas intended to include all of the models in the Stampede Lineup…" (Dkt. #168 at p. 11). Specifically, Traxxas asserts that its intent is confirmed by six "unrefuted" facts: (1) the price point for "the Stampede" matches identically with only Model 3605/36054—the model that Traxxas paid royalties on; (2) the 30,000 units of royalty-free protection only includes the Stampede; (3) the 30,000 did not include the Stampede 4x4 VXL and Stampede 4x4 and would have been a higher number if Traxxas intended to include those models; (4) the royalty reports Traxxas sent for three years only pay on the Stampede Model 3605/36054; (5) the only vehicle in the Stampede Lineup that goes by the name "Stampede" is Stampede Model 3605/36054; and (6) when Traxxas reviewed the License Agreement and FMS' language choice of "the Stampede," Traxxas understood and intended it to be Stampede Model 3605/36054, and understood from the writing that Feld had abandoned its attempt to include the "Stampede Lineup." (Dkt. #168 at p. 11).

The Court finds that Traxxas has not raised a procedural irregularity, but only challenges the evidence supporting the jury's verdict. To receive a new trial, Traxxas must show that the jury verdict rests on a record that does not contain any competent and substantial evidence in support of the verdict. *See Little v. Tech. Specialty Prod. LLC*, No. 4:11-CV-717, 2014 WL 1116895, at *1 (E.D. Tex. Mar. 18, 2014).[19] Additionally, the Court must view the evidence in a

---

[19] Traxxas cites in its motion *Cates v. Creamer*, 431 F.3d 456 (5th Cir. 2005) for the proposition that the Court may grant a new trial if it determines that it is against the "great weight of the evidence." 431 F.3d at 460. In *Cates*, the Fifth Circuit stated the following:

> Several factors guide us in the review of a district court's order granting a new trial: We consider the simplicity of the issues, "pernicious occurrences" at trial, and the extent to which the evidence is in dispute. *Scott v. Monsanto Co.*, 868 F.2d 786, 789 (5th Cir. 1989) (quoting *Smith v.*

light most favorable to the jury's verdict, and the verdict must be affirmed unless the evidence points so strongly and overwhelmingly in favor of one party that the Court believes that reasonable persons could not arrive at a contrary conclusion. *See Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

The Court finds that the evidence does not support Traxxas' argument that the jury's verdict was "against the great weight of the evidence." *See Cates*, 431 F.3d at 460. The Court already concluded that the License Agreement was ambiguous, and that the interpretation of License Agreement was for the jury to determine (Dkt. #160 at p. 6 ("[I]t is your duty to interpret the ambiguous language of the License Agreement."); Dkt. #118 at p. 4). None of Traxxas' six "unrefuted" facts are inconsistent with the jury's verdict, and Feld presented evidence during the trial of its intent to include the entire Stampede Lineup in the License Agreement. As Traxxas has provided the Court with no other basis for a new trial and the Court finds that the jury's verdict is not "against the great weight of the evidence[,]" the Court finds that Traxxas' motion for a new trial should be denied.

*Motion to Amend/Modify the Judgment*

Traxxas requests that the Court amend the judgment and remove the Nitro Stampede, the Stampede 4x4, and the Stampede 4x4 VXL from the jury verdict (Dkt. #168 at p. 13). The Court finds that Traxxas has not demonstrated that there has been (1) an intervening change in controlling law; (2) new evidence not previously available; or (3) the need to correct clear error or manifest injustice. *See In re Benjamin Moore & Co.*, 318 F.3d at 629. Additionally, for the

---

*Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985)). If we determine that one or more of the above factors supports the district judge, we generally affirm the grant of a new trial. *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 931 (5th Cir. 1982). However, even if we find that all three of these factors weigh against the grant of new trial, we may still apply an overriding consideration and affirm the district court's order of a new trial by determining 'independently [] that the jury verdict was against the great weight of the evidence.' *Id.*
*Cates*, 431 F.3d at 460-61.

reasons stated regarding the renewed motion for judgment as a matter of law, the Court finds that sufficient, credible evidence was presented to the jury demonstrating the License Agreement intended to include the Stampede 4x4 and the Stampede 4x4 VXL. However, the Court will address the gas-powered Nitro Stampede below.

The Court finds that the jury had sufficient evidence to read Paragraph two of the License Agreement as not limiting Feld's royalties to only battery-operated vehicles. Paragraph two of the License Agreement states the following:

> 2. **Licensed Articles:** Hobby-grade battery-operated remote control operated monster trucks (**"R/C Vehicle Units"**) and monster truck vehicle bodies (**"R/C Bodies"**) branded with the **Property**. Licensed Articles shall include a minimum of four (4) different monster truck molds of **R/C Bodies** each year, for each year during the Term other than 2010.

(Trial Ex. 11 at p. 11 ¶ 2) (emphasis in original). Traxxas asserts that "[u]nder the plain language 'R/C Vehicle Units' cannot be fuel operated…" (Dkt. #168 at p. 13). Traxxas also argues that Mattorano testified that the Nitro Stampede would be excluded from the License Agreement because it is gas powered (*See* Mattorano Trial Tr. (8/31/2015) at 10:3-25). Feld asserts that Paragraph two and Paragraph five of the License Agreement serve separate roles, and must be read separately (*See* Dkt. #173 at p. 9). Specifically, Feld argues that "[t]he plain language of Paragraph 2 defines which Traxxas products will bear [Feld's] property, whereas by contrast, Paragraph 5 sets out the method for calculating royalties." (Dkt. #173 at p. 9; *see* Trial Ex. 11 at p. 11 ¶¶ 2, 5; Abernethy Trial Tr. (8/27/2015) at 7:18-8:6). Additionally, although originally Jenkins asserted that the two paragraphs serve the same purpose in the License Agreement, he then agreed that the two paragraphs served separate roles (Jenkins Trial Tr. at 79:12-80:14 ("Q. And you're not going to look to that provision [Paragraph 5] to determine what

can I put on a—what can I use the Monster Jam product on. That's what you look to calculating royalties? A. That's correct.")).

The Court finds that Mattorano's testimony is consistent with that of Abernethy and Jenkins. Although Mattorano stated that "gas operated vehicles were ruled out early in the negotiations[,]" Mattorano was discussing whether or not gas-operated products could be licensed articles under Paragraph two of the License Agreement (Mattorano Trial Tr. (8/31/2015) at 10:11-15). At no time during his testimony did Mattorano testify that Paragraphs two and five of the License Agreement were not separate clauses, as stated by Abernethy. Therefore, the Court finds that there was sufficient credible evidence for the jury to conclude that even if "Licensed Articles" must be battery-operated based upon Paragraph two of the License Agreement, Feld was entitled to receive royalties on the entire Stampede Lineup, including the Nitro Stampede under Paragraph five of the License Agreement. Additionally, Traxxas has not pointed to any of the following: (1) an intervening change in the controlling law; (2) a manifest error of law or fact; or (3) newly discovered evidence as is required for a Rule 59(e) motion. *See Templet*, 367 F.3d at 479 ([A 59(e) motion] is "not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment."). Therefore, the Court finds that Traxxas' Motion to Alter/Amend the Judgment should be denied.

## CONCLUSION

It is therefore **ORDERED** that Traxxas, LP's Renewed Motion for Judgment as a Matter of Law, Motion for New Trial or Alternative Motion to Amend/Modify the Judgment (Dkt. #168) is hereby **DENIED**.

**SIGNED this 14th day of April, 2016.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE